Joseph G. Sansone
Co-Chief, Market Abuse Unit
Martin F. Healey
Simona K. Suh
Melanie A. MacLean
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-0103 / suhs@sec.gov (Suh)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

SECURITIES AND EXCHANGE COMMISSION,

                          Plaintiff,

           -against-

KEVIN J. AMELL,

                     Defendant.

No. 17 Civ. _____

COMPLAINT

JURY TRIAL DEMANDED

---

       Plaintiff Securities and Exchange Commission ("Commission") files this Complaint

against Defendant Kevin J. Amell ("Amell" or "Defendant") and alleges as follows:

SUMMARY

       1.      For over two years, Amell, a portfolio manager at a major asset management firm

in Boston, Massachusetts ("Firm A"), carried out a lucrative and fraudulent matched trades

scheme between his personal brokerage account and the brokerage accounts of a registered

investment company ("RIC") managed by Firm A (the "Fund").

       2.      On at least 265 occasions, from December 2014 and through January 2017, Amell

pre-arranged the purchase or sale of call options between the Fund's brokerage accounts, over

which he had trading authority, and his personal brokerage account at prices that were

disadvantageous to the Fund and advantageous to Amell.

3.      The scheme generated over $1.95 million in profits for Amell, at the Fund's

expense.

## VIOLATIONS

4.      By virtue of the conduct alleged herein, Amell violated Sections 17(a)(1) and (3)

of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), (3)], Section 10(b) of

the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a)

and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (c)], and Sections 17(a)(1), 17(a)(2) and 17(j) of

the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. §§ 80a-17(a)(1),

(2), 17(j)] and Rules 17j-1(b)(1), (3) and (4) thereunder [17 C.F.R. §§ 270.17j-1(b)(1), (3), (4)].

5.      Unless Amell is permanently restrained and enjoined, he will again engage in the

acts, practices and courses of business set forth in this Complaint and in acts, practices and

courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6.      The Commission brings this action under the authority conferred upon it by

Sections 20(b) and (d) of the Securities Act [15 U.S.C. §§ 77t(b), (d)], Sections 21(d)(1), (3) and

(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (3), (5)], and Sections 42(d) and (e) of the

Investment Company Act [15 U.S.C. §§ 80a-41(d), (e)].  The Commission seeks a final

judgment: (a) permanently restraining and enjoining the Defendant from engaging in the acts,

practices and courses of business alleged herein; (b) requiring the Defendant to disgorge ill-

gotten gains and to pay prejudgment interest thereon; (c) imposing civil money penalties on the

Defendant pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3)

of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 42(e) of the Investment Company Act

[15 U.S.C. § 80a-41(e)]; and (d) granting such other and further relief as this Court may deem

just and proper.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a)

of the Securities Act [15 U.S.C. §§ 77t(d), 77v(a)], Sections 21(d)(3) and 27 of the Exchange Act

[15 U.S.C. §§ 78u(d)(3), 78aa], and Sections 42(e) and 44 of the Investment Company Act [15

U.S.C. §§ 80a-41(e), 80a-43].

8.      Venue lies in this District pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and Section 44 of the

Investment Company Act [15 U.S.C. § 80a-43].  Certain of the acts, practices, transactions, and

courses of business alleged in this Complaint occurred within the District of Massachusetts.

Among other things, venue lies in this District because Amell resides within the District and

executed his matched trades scheme from within the District.  Firm A employed Amell at its

headquarters in this District.

## DEFENDANT

9.      **Amell**, age 45, is a resident of Hingham, Massachusetts.  He joined Firm A in

2009 as an options trader and, during the relevant time, served as a Vice President and Portfolio

Manager for a RIC (other than the Fund) managed by Firm A.  At all relevant times, Amell was

an employee of Firm A and had trading authority over certain brokerage accounts of Firm A's

clients, including those of the Fund.

## RELEVANT ENTITIES

10.    **Firm A** is a registered investment adviser, headquartered in Boston, Massachusetts.

11.    **The Fund** is a closed-end RIC managed by Firm A and is publicly traded on the New York Stock Exchange.

## FACTS

12.    From December 2014 through at least January 2017, Amell diverted at least $1.95 million from the Fund to himself by pre-arranging at least 265 options trades between his personal brokerage account and the Fund's brokerage accounts, over which he had trading authority.

13.    Amell profited from his matched trades scheme, at the Fund's expense, by either: (1) buying call options from the Fund at artificially low prices and selling them shortly thereafter at higher prices to third parties; or (2) purchasing call options from third parties and selling them shortly thereafter to the Fund at artificially high prices.

14.    In the options markets, as in the equity markets, market participants provide quotes for the National Best Bid ("NBB") (i.e., the highest publicly quoted price at which a market participant is willing to buy a security) and the National Best Offer ("NBO") (i.e., the lowest publicly quoted price at which a market participant is willing to sell a security).  The difference between the two is referred to as the National Best Bid and Offer ("NBBO") spread, or simply the spread.

15.    Typically, the more liquid markets tend to have narrower spreads, whereas the less liquid markets tend to have wider spreads.  Options markets are often less liquid than

equities markets, because, among other things, one stock can underlie dozens of options series at any given time.  Thus, options often have relatively wide NBBO spreads.

16.     Market participants may employ many different strategies to obtain executions at various points within the NBBO spread.  For example, a market participant prioritizing the speed and certainty of obtaining an execution over the price of the trade may decide to "cross the spread" and place a "sell" order priced at or near the NBB, or a "buy" order priced at or near the NBO, to increase the likelihood of obtaining an execution quickly.  By contrast, a market participant prioritizing execution price over the speed or certainty of execution may place a "buy" order priced at or near the NBB, or a "sell" order priced at or near the NBO, with the hope that another trader would enter the market and provide an execution at these more advantageous prices.

17.     To perpetrate his fraudulent scheme, Amell placed orders to trade call options in his personal account at prices that were at or near the NBB (for "buy" orders) or at or near the NBO (for "sell" orders), while also placing matching contra-side orders for the Fund's accounts, which then executed against Amell's personal account orders.  The execution prices for these pre-arranged trades were advantageous to Amell and benefitted him at the Fund's expense. Amell profited from the difference between the advantageous prices of the trades he executed against the Fund and the prices he was able to obtain in arms-length trading with third parties, which were usually closer to the midpoint of the NBBO spread.

18.     In his scheme, Amell usually targeted call options with relatively wide NBBO spreads that ranged from $0.40 to $2.00 per share,[1] which allowed him to generate significant profits from his fraudulent matched trades.

19.     In the majority of the trades executed as part of his scheme, Amell acquired call options from the Fund at prices slightly above the NBB and sold those options to third parties at prices near the midpoint of the NBBO spread.  Figure A below depicts this typical Amell scheme trade.

Figure A



① Amell places a BUY order at a price slightly above the NBB for his personal account.

② Amell places a SELL order for the Fund's account at the same price, which executes against Amell's personal account order.

③ Amell sells the newly acquired options to third parties at prices slightly below the midpoint.

---

[1]     Each call option is, in substance, a contract that gives the option's owner the right to buy 100 shares of the underlying stock at a set price, known as the option's strike price, on or before a set future date, known as the option's expiration date.

20.    In one example, depicted in Figure B below, Amell generated $23,000 in profit in

a little under 23 minutes on September 28, 2016, by buying certain Amazon.com Inc. ("AMZN")

call options from the Fund at a price close to the NBB and then selling those options to third

parties at prices close to the midpoint of the NBBO spread.

Figure B:  September 28, 2016, Trades in AMZN Call Options



21.    As depicted in Figure B, on September 28, 2016, Amell traded in AMZN call

options with a strike price of $870 and an expiration date of November 4, 2016 as follows:

(a)    At 1:51:20 p.m., Amell placed an order in his personal account to buy 200

of these AMZN call option contracts, with the limit price[2] of $15.70 per share, slightly

above the NBB of $15.65.

      (b)     Eleven seconds later, at 1:51:31 p.m., Amell placed an order for the

Fund's account to sell 200 of the same AMZN call option contracts, with the same limit

price, $15.70 per share.  The Fund's order executed immediately against Amell's open

order.

      (c)     At 1:54:23 p.m., three minutes after purchasing the 200 contracts from the

Fund, Amell placed an order to sell 100 of his newly acquired AMZN call option

contracts, with the limit price of $16.70 per share.  Fifty-five contracts executed

immediately for $16.70 per share, with the remaining 45 contracts executing eight

seconds later at the same price, near the midpoint of the NBBO spread.

      (d)     At 2:00:38 p.m., Amell placed an order to sell the remaining 100 AMZN

call option contracts with the limit price of $17.00 per share.  Amell's second order was

filled with three executions over a span of 13 minutes (2 contracts at 2:00:38 p.m., 41

contracts at 2:00:39 p.m., and 57 contracts at 2:13:57 p.m.) at a price of $17.00 per share,

near the midpoint of the NBBO spread.

      (e)     In total, Amell purchased 200 contracts from the Fund at an average price

of $15.70 per share, and then sold those contracts to third parties at an average price of

$16.85 per share, realizing an average profit of $1.15 per share.

      (f)     Because each contract represents 100 shares of AMZN stock, Amell's

---

[2]     A limit order is an order to buy or sell a security at a specific price or better.  A buy limit order can only be executed at the limit price or lower, and a sell limit order can only be executed at the limit price or higher.  A limit order is not guaranteed to execute.  A limit order can only be filled if the stock's market price reaches the limit price.

total profit on this 200-contract trade was $23,000, which he made in approximately 23 minutes.

22.     As Figure A and the AMZN example depicted in Figure B and described in the preceding paragraph illustrate, Amell's scheme profits were realized at the Fund's expense.  Had Amell not priced the Fund's orders to match Amell's open contra-side orders, the Fund could have sold the same call options to third parties in the market at the higher prices that Amell later obtained for himself.

23.     Most of Amell's matched trades involved a pattern similar to that described above and illustrated in Figures A and B:  a purchase of call options for Amell's personal account from the Fund, at a price near the NBB, which was favorable to Amell and unfavorable to the Fund, typically followed by Amell's quick and profitable sale of those options to third parties at prices near the midpoint of the NBBO spread.

24.     The remaining matched trades executed as part of Amell's scheme involved Amell buying call options from third parties at prices near the midpoint of the NBBO spread and typically selling those options to the Fund at prices near the NBO that were favorable to Amell and unfavorable to the Fund.  This pattern of trading is illustrated below in Figure C.

Figure C



1. Amell BUYS options from third parties at prices slightly above the midpoint, for his personal account.

2. Amell places an order to SELL the newly acquired options at a price slightly below the NBO.

3. Amell places an order to BUY the same options at the same price for the Fund's account, which executes against Amell's personal account order.

25.     In one example, depicted in Figure D below, Amell generated $6,000 in profit in under 10 minutes.  On May 26, 2016, Amell bought certain S&P 500 Index Weekly ("SPXW") call options from a third party, at a price close to the midpoint of the NBBO spread, and then sold the options to the Fund at a price near the NBO.

Figure D:  May 26, 2016, Trades in SPXW Call Options



26.     As depicted in Figure D above, on May 26, 2016, Amell traded in SPXW call options with a strike price of $2,090 and an expiration date of May 27, 2016 as follows:

(a)     At 10:02:42 a.m., Amell placed an order in his personal account to buy 200 of these SPXW call option contracts with the limit price of $5.30 per unit,[3] near the midpoint of the NBBO spread.  The order executed immediately against a third party, at a price of $5.30 per unit.

(b)     Less than ten minutes later, at 10:12:17 a.m., Amell placed an order in his personal account to sell 200 of the same SPXW call option contracts, with the limit price of $5.60 per unit, closer to the NBO of $5.70 per unit.

---

[3]     Each index option contract references 100 units of the underlying index, rather than shares of a specific publicly traded stock.

(c)     Six seconds after placing the order in his personal account, Amell placed an order in the Fund's account to buy 200 of the SPXW call options, with the same limit price of $5.60 per unit.  The Fund's order executed immediately against Amell's open order.

(d)     In total, Amell purchased 200 contracts from a third party at a price of $5.30 per unit, and then sold those contracts to the Fund at a price of $5.60 per unit, realizing a profit of $0.30 per unit.

(e)     Because each contract has a multiplier of 100, Amell's total profit on this 200-contract trade was $6,000, which he made in approximately 10 minutes.

27.     Overall, between December 2014 and January 2017, Amell forced the Fund to execute at least 265 matched trades against his personal account, at prices that he intentionally and fraudulently skewed to benefit himself at the Fund's expense.

28.     In December 2016, Amell's personal brokerage account that he had until then used to perpetrate his scheme was closed, after the broker-dealer with which Amell held that account determined to discontinue its relationship with Amell.  Within a few days, Amell opened a new account at a different broker-dealer and quickly resumed his fraudulent trading.  When completing his application for the new account, Amell did not identify Firm A as his employer; instead, Amell falsely represented that his employment was only as an at home trader.

29.     Although Amell was required to disclose all his personal brokerage accounts to Firm A under Firm A's internal policies, Amell fraudulently omitted from his disclosures any reference to the personal brokerage accounts that he used to perpetrate this scheme.

30.     Amell's ill-gotten gains from the scheme exceed $1.95 million.

31.     At all relevant times, Amell was an employee of Firm A.

32.     At all relevant times, Firm A was an investment adviser to the Fund.

33.     At all relevant times, the Fund was a RIC.

## FIRST CLAIM FOR RELIEF
### Violations of Sections 17(a)(1) and (3) of the Securities Act

34.     Paragraphs 1 through 33 are incorporated by reference as if fully set forth herein.

35.     By virtue of the foregoing, Amell, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities:  (1) employed devices, schemes, or artifices to defraud; and (3) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

36.     By virtue of the foregoing, Amell violated and, unless restrained and enjoined, will continue violating, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (3)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and
### Rules 10b-5(a) and (c) Thereunder

37.     Paragraphs 1 through 33 are incorporated by reference as if fully set forth herein.

38.     By virtue of the foregoing, Amell, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange to:  (a) employ devices, schemes, or artifices to defraud; and (c) engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

39.     By virtue of the foregoing, Amell violated and, unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (c)].

### THIRD CLAIM FOR RELIEF
**Violations of Sections 17(a)(1) and (2) of the
Investment Company Act**

40.     Paragraphs 1 through 33 are incorporated by reference as if fully set forth herein.

41.     By virtue of the foregoing, Amell, while being an affiliated person of an investment adviser to a RIC, (1) knowingly sold securities to the RIC and (2) knowingly purchased securities from the RIC, without qualifying for any of the exemptions from liability under Sections 17(a) and (b) of the Investment Company Act [15 U.S.C. §§ 80a-17(a), (b)].

42.     By virtue of the foregoing, Amell violated and, unless restrained and enjoined, will continue violating, Sections 17(a)(1) and (2) of the Investment Company Act [15 U.S.C. §§ 80a-17(a)(1), (2)].

### FOURTH CLAIM FOR RELIEF
**Violations of Section 17j of the Investment Company Act and
Rules 17j-1(b)(1), (3) and (4) Thereunder**

43.     Paragraphs 1 through 33 are incorporated by reference as if fully set forth herein.

44.     By virtue of the foregoing, Amell, while being an affiliated person of an investment adviser to a RIC, in connection with the purchase or sale, directly or indirectly, of Securities Held or to be Acquired by the RIC, as that term is defined in Rule 17j-1(a)(10) under the Investment Company Act [17 C.F.R. § 270.17j-1(a)(10)]:  (1) employed devices, schemes, or artifices to defraud the RIC; (3) engaged in acts, practices or courses of business that operated as a fraud or deceit on the RIC; and (4) engaged in manipulative practices with respect to the RIC.

45.     By virtue of the foregoing, Amell violated and, unless restrained and enjoined, will continue violating, Section 17(j) of the Investment Company Act [15 U.S.C. § 80a-17(j)] and Rules 17j-1(b)(1), (3) and (4) thereunder [17 C.F.R. §§ 270.17j-1(b)(1), (3), (4)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Amell, as well as the following persons who receive actual notice of the injunction by personal service or otherwise: (a) Amell's agents, servants, employees, and attorneys, and (b) other persons in active concert or participation with Amell or with anyone described in (a), from violating Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 17(a)(1), 17(a)(2) and 17(j) of the Investment Company Act [15 U.S.C. §§ 80a-17(a)(1), (2), 17(j)] and Rule 17j-1 thereunder [17 C.F.R. § 270.17j-1].

### II.

Ordering Amell to disgorge, with prejudgment interest, all ill-gotten gains from the conduct alleged in this Complaint.

### III.

Ordering Amell to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 42(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)].

## IV.

Granting such other and further relief as this Court may deem just and proper.


Dated:  New York, New York
        April 24, 2017

_Joseph Sansone_ _____
Joseph G. Sansone
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-0103 / suhs@sec.gov (Suh)

Of Counsel:
Martin F. Healey
Simona K. Suh
Melanie A. MacLean